Mr. Gordon, you have reserved one minute for rebuttal. That gives you nine to start. You may proceed. Thank you. May it please the Court, my name is Kenneth Gordon and I represent the New York City Attorney's Office. Thank you, Mr. Chairman. Lorraine A. Gittens-Bridges. The purpose of this argument, and the focus of this argument, is to issue a survey of other plaintiffs. One is the disparate treatment issue in the New York City Human Rights Law. The other is the New York City Court of Arguments. And again, I'm going to give you a few minutes. With regard to the first, this is disparate impact. Disparate treatment, sorry. The court below finds a wrong statement. The Restoration Act of 2005 substantially changed the New York City Human Rights Law. It made it clear that the standards under federal law and even under the New York State Human Rights Law are not the same. And the statute has been much more liberal. And this has an effect on what happens on some rejections. The key cases here, same as in other cases, which I think you've heard in the broader case, are the Williams case and the Bennett case. And specifically in the Bennett case, the court addressed what is it that a plaintiff has to submit, and evidence has to be presented to oppose a motion to disarm a defendant. And the court said there was what the plaintiff has to do is to provide some evidence that at least one of the reasons proper to file a defendant is false, misleading, or incomplete. The key here, the court below, would be that the Skiddens set forth a provocation case, which means now under McConnel Douglas and also under the City Human Rights Law, the city has to come forward with some alleged non-discriminatory reasons. The city proposed some reasons for what they did, in particular singling out the Skiddens as the only person who passed over the administrative standards test. And not upgrading her record as in cases where she clearly qualified, and nonetheless selected, in most cases, younger candidates. So the question here is, what were the city's reasons for doing this? And is there reason to believe that there's evidence in the writing that those reasons are false, incomplete, or misleading? We go from the story I'm going to read for another minute to some of the most striking instances. One is the city claims that the assignment, there was an assignment handed to the plaintiff, that although the Skiddens claim that she's qualified, there's no documentation in the record of her experience. In fact, the plaintiff had worked for the agency for about three decades, and had risen to a very high level before she was demoted by the assignment in 2014. And then, strangely and very suspiciously and unfortunately, all of the records, all of the files from the plaintiff's appointment before 2014 were damaged. So, of course, the plaintiff didn't have something in the personnel file that she appointed. She mentioned that she's had these very important positions. She mentioned that she's had quite a recruiting position. She's been the section supervisor for the department's personal vision improvement and certification section. She mentioned, among other things, that she's been the activist director of personnel. So the city claimed that there's no documentation. There's only no documentation because they lost all the files. Another example, they said, one of the reasons that we cast you off, one of the reasons we would select you for promotion, is because of your problems with attendance. When you see what you're referring to, though, you can see that these are all misleading at best. One instance was the time that the plaintiff took off in August and September of 2016, when she asked for time so she could work on a political campaign. She applied for that. She received that, and she took the time off to say now that there's an attendance problem. It's not an attendance problem. This is an excuse. The other attendance problem we cite is the fact that Ms. Gibbons was out of the memorial in December of 2018 to 2018. Now, without getting into the merits of what happened then, the fact is that can't have any effect on what happened to Ms. Gibbons in 2014, 15, 16, and 17. Next, they claim that she wasn't selected for promotion because she wasn't performing the duties of even her lower title. She held the title of Associate Staff Analyst in the Section of Promotion, Administrative Staff Analyst. But the only reason she wasn't performing those duties is that they had taken all those duties away from her. This is an all-true catch-22 scenario. Then they say, well, your supervisor, Ms. Mohamed Saluki, criticized her on one occasion. But looking at the record as a whole, we have a court memo from Ms. Mohamed Saluki saying to Ms. Gibbons, you have been doing a great job, and I really appreciate your assistance. They say it was because on one occasion when Ms. Gibbons submitted the memo, somehow that means that she wasn't doing her job. And that's misleading. Well, they also cite the fact that Ms. Gibbons was not the oldest person on the eligible list. But the fact is, she was the only person who passed over when she was one of the oldest people on the list. Right, but I mean, whether there's an inference that is age-based, it would be relevant that people who are of comparable age are not being passed over, right? Absolutely. We're here on a summary judgment, but the question is whether, under these circumstances, there is reason to believe that there could be discrimination. When this comes into contact, the person is the only person who was passed over. Every other passing candidate was suspended. In addition, she was passed over repeatedly for up to eight years. I also want to talk about the house and work environment. The court memo said that the only instances of alleged house and work environment was when Ms. Simon referred to the fact that Mommy and Mr. Pepper said that she was an old-school secretary. Now, those were very, very bad. There are other instances set in plain old record that are far more severe than those. The one thing, the displacement in this record promoting or articulating older duties to someone who had a very high managerial position in the department and now introduced to the court, characterized as clerical tasks, that's humiliating. It's come to work every day. People who knew her as a high-ranking manager now see it as doing clerical work. That is a horrible situation. That certainly creates a house and work environment. So you're using the incidents of what you are alleging is disparate treatment as examples of the hostile work environment? Yes, because they were late to the ball. Yes, that was disparate treatment. But also, I mean— So that would be true in virtually every case, then, where a person is not promoted. Then that also—the lack of a promotion supports a hostile work environment claim? No, not in every case. Well, why wouldn't it? I mean, it would seem to me if you're not promoted and it's humiliating, then that's a hostile work environment claim. That's what you're saying, right? No, what I'm saying here was—I misspoke, I apologize. What I'm saying is Ms. Giddens had these high positions. Those positions were all taken away before she took the exam that she was promoted. Now, it's not even going to work. Her title—forget about these positions where she was secretly looking to promote it through administrative standards. Her title was associate standards. Everybody agrees how the work that she was being given by Ms. Simon and by Mr. Pepperton was very vulnerable and thought-provoking. And everyone has mentioned the claim that Ms. Giddens was referred to. That sounds clear. Everybody knows that she's been reduced. If I'm not promoted, continuing to do the same work I did before, it's very different from someone who was a top manager and now is reduced to federal office. Do you have any authority for the proposition that assignment of lower-level work is relevant to an assessment of hostile work environment? Not—no, I don't want to complicate this as it's happening now, but this is not just a question of what kind of work you assign. This is someone who, for decades, has been a top manager in the agency, now comes to work, and there's no authority for this. That is humiliating. The other thing I want to mention briefly, and this is something that's been made a bunch of by my colleagues here, the case was handled by the Federal Council, and it's very important. The fact of the matter is the deadlines were missed. There was no question about it. There were proper Rule 56 statements, and that's all remarkable. But what also doesn't mention, and what is very important, is that the court saw it on occasion to be virtually sabotaged. But sabotage is a serious statement. It is serious. It is serious. But what happened here was— I'm curious. A claim of discipline or a grievance been made against the— who was the lawyer? Ms. Hagan? Mr. Hagan? Ms. Hagan. Ms. Hagan. I'm not going to quote the discussions with counsel about that possible claim against Ms. Hagan. I don't know if someone has really thought about those. But, yes, that's obviously something that has to be considered. But what happened here—and I've not seen this before— drafts were submitted instead of papers. The Rule 56 statement was a mishmash and was completely stricken. All kinds of things that you might be able to decide on that aren't available. Your statement is authored, which means that there are many instances of very unfortunate statements. Well, all that's true. But, I mean, the district court did sort of nonetheless go through what was submitted, even though it was material that could have been stricken and disregarded. And I understand that. Correct. Responding to a claim in the opposing counsel's brief, somehow this court should do exactly the opposite of what Mr. Ramos did and dismiss that complaint because of all these errors by counsel. And I'm saying that the court should remember that it was an earlier order by the court that counsel send the letter with a copy of the order pointing out all the things that had been mishandled. And that had to be delivered to the defense on September 1, 2021. And seven months went by, and it never happened. The defense first found out about all those problems up in front of the city. And for that reason, the suggestion that the case should be dismissed because of the failings below, I think you should object to that. All right. Yes, you have a minute for rebuttal. All right. We'll hear from Ms. Zalion. Am I pronouncing that right? Yes, you are. Thank you, Your Honor. Yes, indeed. Good morning, Your Honor. Janet Zalion for the Attorneys. Yes, the procedural failures, despite an attorney's whatever is the reason for great incompetent handling, the procedural failures here do warrant affirmation because especially in a voluminous case like this, it's important to call your arguments to the attention of the district court. But in any event, let me go on to the issues. But to the extent the district court did go through the record and make findings, then that's now before us, right? You're not suggesting we should disregard all that and just focus on the deficiencies in the submissions that would have been sufficient to just strike them outright? Well, that's an initial argument that we're making, but I'd like to go on to the way the court analyzed. First of all, with regard to the records of pre-2013 employment, those records were lost. Ms. Gittins admits that her last performance evaluation was in 2000, so it was not that that file would have established the excellence of her performance allegedly during that prior period. What actually happened here is it's an issue of new expectations for the development of that human resources department in a new mayoral administration. Ms. Simon comes in to modernize the department and institute best practices and examines the work that's being undertaken. They had something like 3,000 vacancies. They learned that recruitment and hiring and career counseling were not happening here. So Ms. Simon sought to rectify that with both of the people she hired as supervisors, like Pemberton, who's only a year younger than Ms. Gittins, and also with looking at how her staff is executing their duties. The reference in the promotional issue with regard to the idea that the point that counsel was trying to make about the records, when she first applied for a promotional position, it was noted that her resume wasn't reflecting her duties. She hadn't done those duties in several years. That was the issue there. But what's happening here is people with managerial experience in HR and professional degrees, relevant experience are being hired, and some of them, as counsel emphasized, were not in the Department of Correctional. But they were elsewhere in city administration or were relevant in the private sector, such as the public relations person. In fact, Pemberton himself got one of the promotions in the civil service list, also had worked since the 80s in city government. These are people with relevant, high-level positions in city government and HR. Now, you mentioned there had been a change of administration. This may not be entirely relevant, but she had certainly, she was a deputy commissioner at some point, correct? She was an acting assistant commissioner or assistant director of personnel at some point or some unspecified time. Was she part of the career service or a political appointee? That may not be dispositive of anything. She is a career civil servant. Her title was, whatever her office title was in terms of whatever acting position she filled as an acting person for a while, her title was associate staff analyst. Now, what happened was, when it was determined, and this is why Pemberton, who again is in her age range, said that they were giving her stuff she could do, because she was, they actually did, and Ms. Mohamed Saluki, her direct supervisor for those first couple of years, worked with her to try to give her assignments within her civil service title of associate staff analyst. And she was unable to do that. She was unable to use the computer systems required to do those jobs, and this is what happened was, in a level of difficulty that she was having, she began to, and as this court has said, this court does not sit in a super personality agency to reevaluate whether her supervisors think that she can do the job. They think she could not. She was passed over by Pemberton, her aide-de-camp, for the reason that, I won't call it obvious, but that she was unable to do her job. And in this context, by the way, attendance is a very small issue here during this period, but it is worth knowing that when she was running for political office in 2016, and they offered her or agreed with her to have an intermittent leave that she could take, she was not fulfilling that agreement. So this is during the period where promotions were issued. She was not fulfilling that agreement, and Pemberton had to speak to her about it, but that was an aspect of her not getting the promotion as well. You know, Mr. Gordon mentioned in passing her leave to engage in politics. How does that work? Is there, among the rights of New York City civil servants, is the right to leave, to run for office? I don't think there's anything in the record about that. I'm not aware of anything like that. I think there was an internal agreement made with the supervisor, which of course is another example of the supervisor's trying to work with her. And what happens here is there is nothing that connects. There were numerous people promoted who were either older than her, her age, or slightly younger. Hamilton was her age, and she got one of the promotions. What really happened here was an inability to do her job. In addition, as the court's questioning indicated, the hostile work environment, and the district courts set out to separate the hostile work environment claim away from the disparate treatment claims here. Yes, if she couldn't do her job, it probably felt bad for people to know that she's obviously not doing the kind of job that she was doing. She's not the career counselor, but Simon had found that career counseling was not taking place. People were not getting that advancement. Even the forms that she was updating were not getting done. That's why the court addressed the only evidence at all that makes reference to age that a reasonable jury could even look at as evidence of age is those two remarks. One of them is, unfortunate, but it's, don't worry, my door is always open, which indicates a willingness to work with people. Simon said this at the town meeting. The other one is the old school secretary, which indicates an inability or unwillingness to learn those new tasks. That was what was at issue. These were the expectations that were made of her, and this court can't reassess whether she should have had those duties changed. The only thing this court can assess is whether a reasonable jury would have any basis to find that age that under the city human rights law, right away, there's no issue under the state law here, but whether age could play any factor here. Thank you, Your Honor. Thank you. We'll now hear from Mr. Gordon for a minute of rebuttal. With regard to the files, it's not just missing evaluations. All the documents that would show that she had these very high-level positions, as Your Honor has indicated, and that was gone. Now, people say to me, I have no qualifications. All you're doing is federal law. Well, that only happened because they took away her job, and the documents all disappeared. As for the— But you're not suggesting that the disappearance of the documents is in any way related to discrimination, right? Why did all the documents disappear? I have no—there's nothing in the record that suggests—I don't know why that happened. I have no evidence of somebody doing anything. They're not dead. What I'm saying is, the files are lost. I've been doing this kind of law for half a century. I've never seen anything like this before. Someone's full career suddenly goes up the slope. However that happened, once they did that, if you look at the standards on the Bennett, in evaluating whether the claims that are raised are false or misleading, it's misleading to say that the plaintiff didn't have qualifications, after all the records have been lost. But, I mean, the qualifications were based on observations, more current observations, right? Well, the— They weren't based on the lack of records, were they? Well, with regards to the qualifications, yes. It was a fault. It was a part to the point made by my adversary, the comment by Mr. Muhammad Suleyman. There was one instance where any good supervisor said he didn't do something right or okay, but he has a memo saying he's generally doing a great job. That means that he's incompetent or can't—doesn't have a use for doing anything else that's nonsense. Under Bennett, the question is whether there is anything that they cite, even if it's only one example, they cite a bit more. One instance that's more misleading or confusing or wrong, that that is the basis for an ISM reduction. This is the reason they gave to cite that, that the plaintiff's problems are simply flawed. And with regard to the defendants, I don't understand the point. She wanted to engage in this campaign. She asked for time off. She got the time off to come back and say now that there's something wrong with those algorithms. Thank you. All right. Well, thank you both. We will reserve decision.